UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION


CARL PACE,                      )
                                )
             Plaintiff          )
                                )
        v.                      )    Case No. 2:05 cv 69
                                )
INTERNATIONAL MILL SERVICE,     )
INC.,                           )
                                )
             Defendant          )


OPINION AND ORDER

    This matter is before the court on the Motion for Summary
Judgment filed by the defendant, International Mill Service,
Inc., on March 27, 2006, and on the Motion to Strike the Declara-
tion of the Plaintiff filed by the defendant on October 30, 2006.
For the reasons set forth below, the Motion for Summary Judgment
is **GRANTED IN PART** and **DENIED IN PART**, and the Motion to Strike
the Declaration of the Plaintiff is **GRANTED IN PART** and **DENIED IN
PART**.

Background

    The plaintiff, Carl Pace, worked in the International Mill
Service ("IMS") maintenance department from 1990 until December
30, 2003, as a welder/mechanic. (Deposition of Carl Pace, pp. 6,
14-15) During the time he worked for IMS, Pace was the only
Black welder employed at IMS. (Pace Dep. p. 38) His responsi-
bilities regularly included repairing scrap boxes and hammer
mills, hard surfacing doors and lineup plates, along with some
mechanic duties. (Pace Dep. pp. 9-11) In addition, as a

welder/mechanic, Pace also was required periodically to unload delivery trucks. (Pace Dep. pp. 50-51)

IMS is a supplier to the steel industry that, among other services, recovers scrap metal from the slag produced during the steel-making process. (Deposition of Henry Jelinek, p. 14) One step in this process involves the use of a "hammer mill." (Jelinek Dep. p. 20) This mill is an approximately six-foot cube that contains a series of 300-pound "hammers" mounted to a rotor. (Jelinek Dep. p. 20) Recovery material is fed into the hammer mill, which then breaks apart large pieces of material into smaller pieces. (Jelinek Dep. p. 20) IMS also maintained large scrap boxes that were used in this process and frequently required repair.

As a welder/mechanic, Pace's immediate supervisors were a series of shift foremen who alternated responsibilities during the company's different shifts. (Jelinek Dep. p. 23) As a result, each foreman would supervise Pace's shift every third week. (Jelinek Dep. p. 23) Henry Jelinek was one of these foremen, and for an approximate two-year period ending in 2003, so was Jesse Washington. (Jelinek Dep. p. 23; Deposition of Jesse Washington pp. 6-7) Since 1999, the shift foremen were supervised by Dan Bolanowski, IMS's assistant superintendent of maintenance, who in turn reported to Murl Anderson, the superintendent of mainte-nance. (Deposition of Dan Bolanowski, pp. 7-8; Declaration of Murl Anderson, ¶ 2) Ray Rivas, the general manager, was the

highest level supervisor for IMS at the location where Pace worked. (Declaration of Ray Rivas, ¶ 2)

IMS maintains a safety policy referred to as a "lock out, tag out" policy. According to the policy, employees are required to place a lock on a machine when they are performing maintenance on that machine. (Def. Br. p. 3)  The employee to whom the lock is assigned is the only individual able to unlock the machine. The policy is designed to prevent others from energizing the machine while an employee is performing maintenance. (Def. Br. p. 3) IMS employees were instructed that their personal lock-out locks should be used only for de-energizing equipment. (Pace Dep. pp. 12-13)

On December 30, 2003, IMS discovered that Pace violated the lock-out, tag-out policy when he placed his lock-out lock on his personal locker. (Pace Dep. pp. 13-14)  As a result of this violation,  Pace was suspended for five days, pending discharge. (Def. Br. p. 1)

Following this suspension, Pace filed a grievance under the Collective Bargaining Agreement protesting the discipline. (Pace Dep. p. 15)  On January 5, 2004, he attended a grievance meeting, and he stated that he felt he was given a harsh punishment because of his race. (Pace Dep. pp. 16-17; Pace Dep. Exh. 1)  At the grievance meeting, IMS representatives advised Pace that he had been fired, but they also stated that he would be reinstated. (Pace Dep. p. 17) Pace was directed to return to work later that day. (Pace Dep. p. 17)  However, Pace did not report back to

work on January 5, and he called the next day indicating that he was taking the day off.  (Pace Dep. pp. 17-18)  On January 6, when Pace called to take the day off, he also said that he would call when he was ready to report back to work.  (Pace Dep. p. 18) He did not return to work in January 2004, and he has not returned to work for IMS since December 30, 2003.  (Def. Br. p. 2)

One day after the grievance hearing, on January 6, 2004, Pace applied for a pension through the Local 150 pension fund. (Pace Dep. p. 21)  Under the terms of the pension agreement with Local 150, anyone receiving a pension may not participate in any covered employment because that would invalidate his pension. (Pace Dep. p. 22)  Pace also applied for and began receiving Social Security retirement benefits.  (Pace Dep. p. 22)

Pace filed a charge of discrimination with the Gary Human Relations Commission on January 15, 2004. In the charge, he stated that "he was denied the terms and conditions of employment afforded my white co-workers," based upon IMS's response to the lock-out, tag-out violation and that he was discriminated against on the basis of race. (Pace Dep. Exh. 4) Specifically, Pace complained that he was assigned to only the least desirable tasks compared with White welders, that the term "nigger" frequently was used in his presence, that he was denied overtime opportunities comparable to White welders, and that his supervisors were non-responsive to his complaints. In his complaint, brought pursuant to 42 U.S.C §1981, Pace alleges that his treatment at

4

IMS amounted to a hostile work environment and lead to his constructive discharge.

Discussion

**Motion to Strike**

The parties' initial dispute regards the admissibility of an affidavit filed by Pace. To support a claim that has been challenged on summary judgment, an affidavit may not be based upon "self-serving statements . . . without factual support in the record." ***Thanongsinh v. Board of Education***, 462 F.3d 762, 781 (7th Cir. 2006)(*quoting* ***Butts v. Aurora Health Care, Inc***., 387 F.3d 921, 925 (7th Cir. 2004). Rather, Federal Rule of Civil Procedure 56(e) requires that an affidavit must be "made on personal knowledge [and] set forth facts as would be admissible in evidence." This rule further provides that an affidavit offered in opposition to a motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e); ***Drake v. Minnesota Mining and Manufacturing Company***, 134 F.3d 878, 886 (7th Cir. 1998)(*quoting* ***Hadley v. County of DuPage***, 715 F.2d 1238, 1243 (7th Cir. 1983)("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

In addition, a party resisting summary judgment may not "patch-up potentially damaging deposition testimony with a contradictory affidavit." ***Commercial Underwriters Insurance***

5

*Company v. Aires Environmental Services, Ltd.*, 259 F.3d 792, 799 (7th Cir. 2001). *See also* **Buckner v. Sam's Club, Inc.**, 75 F.3d 290, 292 (7th Cir. 1996)("[T]he law of this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict deposition or sworn testimony.").

Portions of the affidavit submitted by Pace are significantly flawed. However, these shortcomings are not entirely fatal. In his affidavit, Pace stated the general conclusion that he was "constantly" assigned "nigger work," which he stated included welding scrap boxes, hammers, and other work that White welders refused to do. Like these statements, additional assertions made by Pace give no more specific indication of when or how frequently alleged occurrences took place than "often," "usually," "constantly," or "frequently." In addition, statements that specific individuals discriminated against him also are made without reference to when these statements were made or any other contextual details. These statements do not demonstrate the specificity required by the rules.

Other statements within the affidavit provide conclusions that lack support elsewhere in the record. For instance, Pace stated that "Mr. Kaczmarek constantly harassed me because I was black." He stated that "other co-workers also used the term 'nigger' with great frequency." Pace related that "Mr. Kaczmarek always provided new 'welding greens' to white welders." The record contains no further evidence, such as deposition testi-

mony, regarding these allegations. Accordingly, the court can not consider this evidence.

Even in the instances when Pace sets out an allegation regarding a witness who was deposed, the record lacks further support for some of Pace's conclusory statements. For instance, Pace stated that when he complained to a supervisor, Murl Anderson, about Kaczmarek's conduct, Anderson's sole response was "what are you going to do, sue me." The fact that Pace apparently chose not to question Anderson regarding this statement during Anderson's deposition (or to otherwise support this assertion), and has not provided any further detail regarding the context of the statement, renders it inadmissible.

Nevertheless, other assertions made by Pace are not wholly without support. His assertions about the use of the term "nigger" at IMS are supported by multiple additional pieces of evidence. James Tomich, an IMS employee, stated that it was used on more than one occasion and further explained that "when you work with such a vast group of guys . . . you have some people that do not like colored people at all." (Deposition of James Tomich p. 27) In addition, the assistant superintendent, Murl Anderson, also testified that the word was used with some frequency, though he could not remember details. (Deposition of Murl Anderson p. 56) Pace's supervisor, Jelinek, also used the word in conversation with Pace, explaining:

> Q.   And do you remember telling Carl [Pace]
>      that you didn't know you could get along
>      so well with a nigger?

7

> A.   No I didn't say that.
>
> Q.   Did you say anything along those lines?
>
> A.   I did say that word, but I did not mean
>      it derogatory at all.
>
> (Jelinek Dep. p. 44)

Notwithstanding Pace's unfortunate decision to term it "nigger work," his allegation that he was required disproportion- ately to do the least desirable work among the welders also is supported by the record. Pace has submitted evidence to show that through the years 2001 through 2004, he was assigned over 92 percent of the welding performed on hammers and hammer mills. (Declaration of Mike Rogers, ¶ 5)  In addition, though one of up to 20 welders, Pace did almost half of all welding on scrap boxes. (Rogers Dec. ¶ 5) Pace also has submitted the deposition testimony of Tomich, who stated with respect to the hammers that "most guys wouldn't even deal with them." (Tomich Dep. p. 25) Further, Pace has submitted the testimony of IMS superintendent Anderson regarding Pace's complaints about this work:

> Q.   Did [Pace] ever complain about being the
>      only one?
>
> A.   At the time he was doing it, yeah, but
>      he was the only person that did it at
>      that time.
>
> Q.   Why was that?
>
> A.   Because that was his job?
>
> (Anderson Dep. p. 54)

This circular reasoning, apparently dismissing Pace's complaints about being the only person assigned to certain work because he

was the only person assigned to this work, clearly does not undermine the assertions made in his affidavit. *See **Butts***, 387 F.3d at 925.

Finally, IMS does not support the argument that Pace's affidavit should be stricken on the grounds that it contradicts his deposition testimony. While IMS noted Pace's statements that are general conclusions without factual support, IMS has pointed to no portion of Pace's affidavit that is inconsistent with his earlier sworn testimony. *See **Buckner***, 75 F.3d at 293; ***Fanslow v. Chicago Manufacturing Center, Inc.***, 384 F.3d 469, 482 (7th Cir. 2004)("We find no inherent inconsistency between Fanslow's affidavit and deposition.").  In addition, Pace testified at his deposition about the work distribution at IMS, noting that he worked on jobs other than hammers and scrap boxes, work that apparently took place at one time in a "shanty" outside of the shop, only when other welders were on vacation. (Pace Dep. p. 9)

Accordingly, the allegations made in Pace's declaration regarding the disproportionate balance of work at IMS and the use of the term "nigger" at IMS are admissible. Based on the foregoing, the court concludes that Pace's declaration is admissible, with the exception of paragraphs 11-14, 22-25, 28-30, 33 and 38.

### Motion for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is proper only if it is demonstrated that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *See **Celotex Corp. v.***

*Catrett*, 477 U.S. 317, 322-23, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986); *Lawrence v. Kenosha County*, 391 F.3d 837, 841 (7th Cir. 2004); *Branham v. Snow*, 392 F.3d 896, 901 (7th Cir. 2004); *Windle v. City of Marion, Indiana*, 321 F.3d 658, 660-61 (7th Cir. 2003), *cert. denied*, 540 U.S. 873, 124 S.Ct. 873, 157 L.Ed.2d 133 (2003).  The burden is upon the moving party to establish that no material facts are in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 160, 90 S.Ct. 1598, 1610, 26 L.Ed.2d 142, 155 (1970); *Lawrence*, 391 F.3d at 841. A fact is material if it is outcome determinative under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986); *Ballance v. City of Springfield, Illinois Police Department*, 424 F.3d 614, 616 (7th Cir. 2005); *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004); *Palmer v. Marion County*, 327 F.3d 588, 592 (7th Cir. 2003).  Even if the facts are not in dispute, summary judgment is inappropriate when the information before the court reveals a good faith dispute as to inferences to be drawn from those facts. *Spiegula v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004); *Hines v. British Steel Corporation*, 907 F.2d 726, 728 (7th Cir. 1990).  Finally, summary judgment "will not be defeated simply because motive or intent are involved." *Roger v. Yellow Freight Systems, Inc.*, 21 F.3d 146, 148 (7th Cir. 1994).  *See also Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999); *Plair v E.J. Brach & Sons, Inc.*, 105 F.3d 343, 346 (7th Cir.

1997); *United Association of Black Landscapers v. City of Milwau-
kee*, 916 F.2d 1261, 1268 (7th Cir. 1990).

In deciding a motion for summary judgment, the trial court
must determine whether the evidence presented by the party
opposed to the summary judgment is such that a reasonable jury
might find in favor of that party after a trial.

> The inquiry performed is the threshold in-
> quiry of determining whether there is the
> need for a trial--whether, in other words,
> there are any genuine factual issues that
> properly can be resolved only by a finder of
> fact because they may reasonably be resolved
> in favor of either party.
>
> [T]his standard mirrors the standard for a
> directed verdict under Federal Rule of Civil
> Procedure 50(a), which is that the trial
> judge must direct a verdict if, under the
> governing law, there can be but one reason-
> able conclusion as to the verdict.
>
> *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511

*See also* *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,
149-151, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105, 120-22 (2000)
(setting out the standard for a directed verdict); *Celotex Corp.*,
477 U.S. at 322-323, 106 S.Ct. at 2553; *Branham*, 392 F.3d at 901;
*Lawrence*, 391 F.3d at 841; *Hottenroth*, 388 F.3d at 1027 (stating
that a genuine issue is one on which "a reasonable fact finder
could find for the nonmoving party"); *Schuster v. Lucent Technol-
ogies, Inc.*, 327 F.3d 569, 573 (7th Cir. 2003)(stating that a
genuine issue exists and summary judgment is inappropriate if
there is sufficient evidence for a jury to return a verdict for
the nonmoving party).

Turning to the merits of Pace's complaint, IMS seeks summary judgment, reasoning that Pace has not shown a hostile work environment, and as a result, also cannot show constructive discharge.  Pace's complaint is brought pursuant to 42 U.S.C. §1981, which provides that "all persons within the jurisdiction of the United States shall have the same right . . . to the full and equal benefit of the laws . . . as is enjoyed by white citizens." 42 U.S.C. §1981.  This section has been interpreted to prohibit racial discrimination in employment. *Johnson v. Railway Express Agency*, 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975).  Similarly, Title VII of the Civil Rights Act of 1964 makes it an unlawful employment practice for an employer to "fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. §2000e-2(a)(1).  Section 1981 claims are assessed under the same standards that govern liability under Title VII.  *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403 (7th Cir. 2007); *Fane v. Locke Reynolds, LLP*, ___ F.3d ___, 2007 WL 756933 at *3 (7th Cir. 2007).

A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691

12

(7th Cir. 2005).  To prove a hostile work environment claim, a plaintiff must show: "1) that the work environment was both subjectively and objectively offensive; 2) that the harassment was based on membership in a protected class; 3) that the conduct was severe or pervasive; and 4) that there is a basis for employer liability." *Mendenhall*, 419 F.3d at 691.  An environment that is both subjectively and objectively offensive is "one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." *Cerros v. Steel Technologies., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002).  When deciding whether the conduct creates an objectively hostile work environment, "this court must evaluate the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004); *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 534 (7th Cir. 1993).  The court must consider the effect that the conduct actually had on the plaintiff and the impact it likely would have had on a reasonable employee in the plaintiff's position. *Saxton*, 10 F.3d at 534.

"Harassment need not be severe *and* pervasive to impose liability; one or the other will do." *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 808 (7th Cir. 2000)(emphasis added). There is no magic number of incidents needed to establish a

13

hostile environment. *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 445 (7th Cir. 1994). In fact, even one incident of harassment will be sufficient if it is egregious. *Hostetler*, 218 F.3d at 808. There are some acts of harassment which, when viewed in isolation, will not rise to a sufficient level of severity or pervasiveness, but when viewed cumulatively, might support such a claim. *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 810-811 (7th Cir. 2001); *Hostetler*, 218 F.3d at 808. However, instances of harassment that are few and far between typically will not be severe or pervasive enough to support a Title VII claim. *Hostetler*, 218 F.3d at 808.

IMS first argues that Pace's claim of a racially hostile work environment cannot be based upon an assertion that he was given only the most undesirable assignments. IMS's argument is based on the theory that there is no such category of welding known as "undesirable" welding. In support, IMS elicited testimony that, in his training, Pace was not taught a course entitled "undesirable welding" and that a book on welding would not include a chapter titled "undesirable welding." IMS has accused Pace's attorney of inventing the phrase when drafting the complaint in this matter. IMS has offered no explanation why it has ignored the common meaning of the term "undesirable" as it regards a work environment or why it has insisted that the term is relevant only if it has a unique application to the welding profession. The argument borders upon the frivolous.

14

In fact, Pace's co-worker, Tomich, shed considerable light on the use of this term when he stated that most welders at IMS refused to "deal with" welding on the hammers. Further, this issue is not, as IMS suggests, determined by the conclusion that such work was fair game for any of the IMS welders. Rather, the determinative issue is why Pace, IMS's only Black welder, ended up doing approximately 92 percent of this work, and though one of 10 to 20 welders, almost half of all scrap box welding.

IMS has offered no explanation for this other than the general statement that it was his job and that Pace has not shown that his work assignments were racially motivated. In light of the totality of admissible evidence Pace has offered, the court concludes that a reasonable jury could find the conditions of Pace's employment racially motivated. Whether Pace was assigned a disproportionate share of the work that other, White welders, refused to deal with because of his race raises questions of fact. *See* **Berry**, 260 F.3d at 810-811 ("[C]ourts should avoid disaggregating a hostile work environment claim, dividing conduct into instances of racial or national origin-based conduct and instances of unequal treatment, then discounting the latter category of conduct, thereby robbing instances of racial or national-origin based harassment of their cumulative effect.") (internal quotations omitted).

In addition to his work assignment, Pace's allegations regarding the use of the term "nigger" are not, as the defendant argues, limited to the single instance when a co-worker allegedly

15

expressed surprise that he was able to get along with a nigger.
Pace testified that the term was used regularly at IMS. Though
the frequency with which this term was used is not clear, Pace's
allegations gain support from the testimony of his co-worker
Tomich, as well as supervisors Anderson and Jelinek. Tomich
explained that the word was used at IMS but it could be expected
because there were people at IMS that "don't like colored peo-
ple." Anderson testified that "nigger" was used with some fre-
quency, though he could not be certain he had heard it more than
20 times. Pace's testimony also addressed the subject. In re-
sponse to the defendant's question regarding supervisors who Pace
believed were racially biased, he stated:

> A.   One of them is Dan Bolanowski. The other
>      one was Hank Jelinek. He was there - out
>      there even when I was there. He had that
>      bad - talking about the nigger thing.
>
> Q.   I don't believe I've used that word.
>
> A.   Well - but I'm telling you what he used.
>
> Q.   All right.
>
> A.   Because I'm telling you, he got so se-
>      vere with that word. I ain't - I'm tell-
>      ing you, I'm not lying. I had to - I had
>      to talk about - and Dale Manns and Bell.
>      Bell, he heard it when it came out of
>      Hank's mouth.

The defendant's argument that the use of the term cannot
rise to a hostile work environment because it was not directed at
Pace misstates that law. Recognizing that "an unambiguously
racial epithet falls on the more severe end of the spectrum," a
reasonable jury could find the use of the term "nigger" at IMS a

factor contributing to a hostile work environment. *Cerros*, 288 F.3d at 1047; *Hrobowski v. Worthington Steel Company*, 358 F.3d 473, 477 (7th Cir. 2004)(concluding that a reasonable jury could find a hostile work environment based upon the plaintiff's testimony regarding "frequent" use of the term "nigger" and other inappropriate comments.). *See also Jackson v. County of Racine*, 474 F.3d 493, 500 (7th Cir. 2007)(*citing Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) ("[W]e note that all parties in this case seem to think that a working environment must be 'hellish' before a Title VII suit can succeed. The Supreme Court's decision in *Harris* establishes that something short of the Ninth Ring may violate the statute.").

IMS has made a cursory challenge to Pace's hostile work environment claim, stating that Pace "has an obligation to complain if he feels he is being treated in a racially offensive manner" and that there is no material issue of fact regarding Pace's failure to complain. However, the record reveals numerous instances in which Pace voiced concern over perceived racial bias. Further, Pace's so-called obligation to complain is implicated in instances of "co-worker" harassment. It is not implicated when a plaintiff complains of discrimination at the hands of his supervisor. Further, in circumstances of co-worker harassment, complying with an employer's complaint procedure is not the sole means by which an employee may meet this obligation. *See Cerros v. Steel Technologies*, 398 F.3d 944, 952 (7th Cir. 2005)(*quoting Burlington Industries, Inc. v. Ellerth*, 524 U.S.

742, 765, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998)("[A]n employer must prove that 'the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise'"). The record indicates that Pace did complain to a shift foreman, Washington, and to the plant's general manager, Rivas. Neither party has addressed whether these complaints were reasonable responses to IMS's harassment policies. Accordingly, summary judgment is not appropriate on these grounds.

The parties also dispute whether Pace was given access to fewer overtime hours than his White counterparts. Pace's allegation that he did not receive as much overtime as White welders, despite his requests, is not supported by the record. Specifically, the records provided by Pace indicated that he was in the middle of the pack in terms of the amount of overtime actually worked, and the amount refused. Pace was closer to the bottom of the list on the chart depicting overtime during 2003-2004, but there is no evidence to indicate that this was a result of racial discrimination. Rather, the testimony of Tomich indicated that overtime was distributed according to a system that first offered overtime to the welder who currently had the least overtime. In addition, payroll records indicate that Pace's salary was higher than the average among other welders. Accordingly, the amount of overtime that the Pace received does not constitute evidence of a hostile work environment.

Pace also has not shown that the five-day suspension he received for the lock-out, tag-out violation was disproportionately higher than suspensions received by White employees for similar violations. Even before the Pace's suspension for a lock-out, tag-out violation, IMS had suspended a White employee for a similar violation.  After Pace's suspension, IMS suspended three White employees for violations of the lock-out, tag-out policy.  Pace points solely to his own declaration to state that there is one example of a violation of this policy that created a greater safety risk than his violation but resulted in a less severe punishment. However, Pace does not provide any evidence that the punishment for a lock-out, tag-out violation was gauged by the potential risk of the violation. Without further support in the record, this evidence is insufficient to survive summary judgment. *See e.g.* **Alexander v. Wisconsin Department of Health and Family Services**, 263 F.3d 673, 683-685 (7th Cir. 2001)(noting that the defendant's more stringent discipline policy, beginning with the plaintiff's discipline and thus a harsher penalty than others had received, did not constitute evidence of racial discrimination).

Finally, for the first time in its reply brief, the defendant voiced an objection based on the allegation that Pace, in his EEOC charge, complained only about his discipline for the lock-out, tag-out violation. However, IMS did not explain why Pace's EEOC charge, which does in fact include a general allegation regarding race-based discrimination, is relevant to a claim

brought under §1981. *See **Fane***, 2007 WL 756933 at *4 ([Section] 1981 . . . does not require a plaintiff to bring an EEOC charge before filing a claim in federal court). Similarly, the defendant raised for the first time an affirmative defense based upon the statute of limitations for §1981 actions. The defendant has waived the opportunity to resolve this issue by summary judgment because it failed to raise it until its reply brief. *See **Hart v. Transit Management of Racine, Inc***., 426 F.3d 863, 867 (7th Cir.2005) ("Arguments that first appear in a reply brief are deemed waived."). Accordingly, IMS is not entitled to summary judgment on Pace's hostile work environment claim.

IMS also has claimed that the conditions of Pace's employment could not lead to his constructive discharge. A constructive discharge occurs "when an employee's discriminatory working conditions are so intolerable that a reasonable person in his position would be compelled to resign." ***Perry v. Harris Chernin, Inc***., 126 F.3d 1010, 1015 (7th Cir. 1997). "Unless the conditions are beyond ordinary discrimination though, the complaining employee is expected to remain on the job while seeking redress." ***Perry***, 126 F.3d at 1015. To show that a hostile work environment caused a constructive discharge, a plaintiff must show both that a hostile work environment existed and that the working conditions were so intolerable that resignation or retirement was the only appropriate response. ***Herron***, 388 F.3d at 303. "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt

20

compelled to resign?" ***Levenstein v. Salafsky***, 414 F.3d 767, 774
(7th Cir. 2005).

Resolving all reasonable questions of fact in Pace's favor,
the conditions Pace endured at IMS do not lead to the conclusion
that he was constructively discharged. Pace stated that his lock-
out, tag-out suspension was the "straw that broke my back,"
finally leaving him with no option but to resign. However, the
court already has found that Pace has not shown that this suspen-
sion was racially motivated. In addition, Pace resigned while
this matter still was being addressed within the established
grievance procedure. Though the court concludes that questions of
fact remain in this matter regarding Pace's hostile work environ-
ment claim, Pace has offered no argument beyond this suspension
in further support of a constructive discharge claim. IMS is
entitled to summary judgment on this claim.

———————————

For the foregoing reasons, the Motion for Summary Judgment
filed by the defendant, International Mill Service, Inc., on
March 27, 2006, is **GRANTED IN PART** and **DENIED IN PART,** and the
Motion to Strike the Declaration of the Plaintiff filed by the
defendant on October 30, 2006 is **GRANTED IN PART** and **DENIED IN
PART**.

ENTERED this 29th day of March, 2007

                          Andrew P. Rodovich
                          United States Magistrate Judge